**Opinion issued October 16, 2014**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-10-01123-CV

_____

## ONCOR ELECTRIC DELIVERY COMPANY, LLC, Appellant

## V.

## MARCO MURILLO, Appellee

On Appeal from the 165th District Court
Harris County, Texas
Trial Court Case No. 0864374

## DISSENTING OPINION ON EN BANC RECONSIDERATION

This is an important case. It goes to the distinction between the liability of a premises owner for injury caused by its own negligent activity in controlling an aspect of the manner of work on a worksite and the liability of a premises owner for injury caused by a premises defect. The en banc majority determines, as a

threshold matter, that the trial court erred in submitting this case to the jury on the negligence theory of liability pleaded by the plaintiff, Marco Murillo, rather than on the appellant premises owner's premises-defect defense. It then substitutes premises defect definitions and instructions for those in the charge, determines the sufficiency of the evidence to support the jury's findings under the charge it believes *should* have been submitted to the jury rather than the charge that actually *was* submitted, and renders judgment in favor of appellant Oncor Electric Delivery Company, LLC on that unsubmitted charge. It fails even to state the issues presented by Oncor on appeal or to address the charge actually submitted to the jury and the evidence in support of the jury's findings. It thus eliminates the distinction between the liability of a premises owner for its own negligent activity and its liability for a premises defect and denies a plaintiff the right to sue a premises owner whose ongoing negligent activity creates a dangerous workplace.

I believe this is error that goes to the heart of the litigation process and the plaintiff's right to have his case succeed or fail on his own theory of liability—not on a defendant's preferred theory. The en banc majority opinion also contravenes controlling supreme court law. I, therefore, respectfully dissent. And I urge the supreme court to take this case (1) to clarify the law distinguishing the liability of a premises owner/occupier for its own negligent activity from an owner/occupier's liability for a premises defect of which it was aware and (2) to clarify the law

2

governing jury charge error when a case is submitted to the jury on broad-form questions on the plaintiff's general negligence theory of liability over a defendant's objection that the case should have been submitted to the jury on questions and instructions on its own premises-defect defense and not on the plaintiff's pleaded theory.

This case arose out of the near electrocution of Murillo, an employee of AAA, a salvage company subcontractor working on a demolition and electrical utility removal worksite. Oncor contractually assumed control over the distribution of electricity to the site until all of its electrical utilities were removed. However, it failed to disconnect one of the live electricity cables running to one of the transformers when it sent a crew to the site for that purpose so that the disconnection, material salvage, and utility removal operations could proceed safely. Oncor thus continued to distribute live electricity through that cable to the transformer on Pad B. Murillo reached into the open transformer box in the course of his work on the site to disconnect the electricity cable so that its copper could be salvaged and the transformer removed and was severely injured by the live electric current Oncor was continuing to distribute through the cable.

Oncor argues, first, that Murillo's case against it was incorrectly submitted to the jury as a claim that "Oncor was negligent for failing to warn that the transformer was energized or not de-energizing the transformer." However, that

3

was not Murillo's claim. Murillo claimed that Oncor was negligent for failing to de-energize the transformer when it sent a crew to the site for that purpose *and* for continuing to distribute electricity to the transformer on Pad B scheduled for removal, causing him to be injured when he attempted to disconnect the live cable from the transformer.

Oncor also argues in its first issue that "Murillo's only potentially viable claim" was for a premises defect, which Murillo waived by failing to plead it. And it argues that Murillo's claim against it should have been submitted to the jury by questions and instructions on its own premises defect theory rather than on the broad-form negligence question and accompanying instructions sought by Murillo and actually submitted by the trial court. However, it does *not* state that it never sought to have its defensive theory submitted to the jury on inferential rebuttal instructions; it sought *only* to substitute its theory for Murillo's in the questions to the jury.

Oncor argues in its second issue that the evidence was not legally or factually sufficient to support the jury's affirmative answers to questions requiring Murillo to prove: "(1) that Oncor exercised or retained control over the manner in which Murillo's work in the transformer was performed; (2) that Murillo was injured by or as a contemporaneous result of some activity of Oncor; and (3) that Oncor's negligence, if any, proximately caused the injury." In other words, it

4

argues that the evidence, viewed in the light most favorable to *it*, does not support *its own theory* of premises defect liability—with its different legal definitions of control and duty from those actually submitted. It does not argue that the evidence does not support the jury's findings on the *plaintiff's* theory as actually submitted, viewed in the light most favorable to *Murillo*, as required by the standard of review of sufficiency of the evidence.

Oncor argues, third, that Murillo's exclusive remedy against it was a claim for premises defect liability under Civil Practice and Remedies Code Chapter 95, which it pled as a defense. And it argues that *Murillo* waived this claim by not securing findings on the essential elements of premises defect liability set out in Chapter 95. Oncor does *not* argue that *it* waived its right to inferential rebuttal instructions on its own defensive theory by failing to seek them. Rather, it urges that judgment be rendered in its favor because the case was submitted to the jury on Murillo's general negligence theory, over its objection.

The en banc majority accepts Oncor's arguments. Rather than judging the sufficiency of the evidence to support the verdict under the charge actually given, it frames the sole issue before this Court as whether "the trial court erred in submitting a general negligence charge to the jury with respect to an electricity-carrier defendant," and it immediately concludes that "[b]ecause the trial court erred in rendering judgment against Oncor on a general negligence claim, we

5

reverse." Slip Op. at 2. Thus, as a threshold matter, it rejects the negligent activity case that was presented to the jury at trial and views the case solely on Oncor's theory as a premises defect case.

Accordingly, the en banc majority does not set out the elements of proof of negligent activity by a premises owner/occupier or determine whether the record supported the submission of Murillo's claims to the jury on a broad-form general negligence theory. It does not state the elements of general negligence set out in the jury charge, on which the jury was asked to make findings. Nor does it examine, in the light most favorable to Murillo, the sufficiency of the evidence to support the jury's findings. It also fails to distinguish the proper jury charge in a negligent activity case from the proper charge in a premises defect case. And it fails to address whether Oncor properly presented its objections to Murillo's theory of the case and properly preserved error in the charge. I believe these inquiries are critical to the proper disposition of the issues in this case.

Because the en banc majority does not analyze the case as a negligent activity case, it also does not address evidence material to the establishment of Oncor's duty and breach on such a theory. This evidence includes the service agreement between Oncor and the premises owner, Next Block 1—Dallas LP ("Next Block"), likewise a defendant, under which Oncor agreed to control electricity distribution services to the worksite until the "complete removal" of all

6

of its utilities from the site and its actual control of the electricity distribution as the work progressed on the site. Nor does it address as acts of negligence that proximately caused Murillo's injuries Oncor's sending a crew to the site on June 12 to disconnect the power to the transformer that injured Murillo, Oncor's leaving the transformer pad partially energized even after it discontinued the customer account and removed its meters, and its ongoing negligent distribution of electricity through the live cable to the site during the utility removal process after closing the customer account.

The en banc majority simply determines that Oncor's "last activity with respect to the transformers was on June 11 or 12." Slip Op. at 18. And it mistakenly claims that "[c]ontrol over distribution of electrical power is not control over demolition and salvage work" on a worksite. *See id.* at 20. It is, however, material evidence of Oncor's exercise of control over a critical aspect of the manner in which the workmen were to perform their work, namely, whether they were to disconnect Oncor's electricity cables from the transformers scheduled for removal safely or unsafely because they were still energized.

The en banc majority disregards the evidence that Oncor specifically undertook to control the distribution of electricity to the worksite until the removal of all of its utilities. It fails to cite testimony from Oncor and others that the customary practice on the worksite was for Oncor to leave the open transformer

7

boxes until it could get to them and for both Oncor and AAA to participate in removing the electricity cables and salvaging the wiring prior to Oncor's removal of the transformers from the worksite. And it disregards Murillo's uncontradicted testimony that, on multiple occasions throughout the project, Oncor crews observed both Murillo and other AAA workmen removing cables from Oncor's transformers as part of the utility disconnection, material salvage, and transformer removal operations.

The majority references only Oncor's representation to its customer, Next Block, that it had cancelled service effective June 11; Oncor's representation in its work records that the last electricity to the property had been turned off on June 12, which Oncor characterizes as evidence that "this work was done"; and Oncor's evidence that its workmen never spoke to the AAA workmen. Slip Op. at 19–20. It then takes this evidence as conclusive evidence that Oncor had no ongoing duty of ordinary care in controlling the distribution of electricity to the worksite for the safety of the workmen.

Consequently, the en banc majority holds, as a matter of law, that Oncor could not be liable to Murillo for its negligence on the worksite because its activity with respect to the worksite ceased more than a month before Murillo's injury. *Id.* at 21. And it concludes that "[w]ithout evidence of contemporaneous conduct, Murillo's claim against Oncor is a premises liability theory," that "Oncor's duty

8

was, at most, that of an occupier of the premises," and that, therefore, "Oncor was entitled to standard jury instructions" applicable to a utilities easement owner/occupier and could not be sued by Murillo for its negligence. *Id.* at 21–23. Finding no breach of duty by Oncor, it renders judgment in Oncor's favor.

But the duty upon which the en banc majority decides the case—the duty of a premises owner to members of the general public who are not trespassing in a utilities easement—is *not* the duty submitted to the jury and it is *not* a concept on which the defendants sought a legal ruling prior to submission. And the en banc majority's legal conclusion that Oncor's negligence was not contemporaneous with Murillo's injury is exactly the *opposite* of the jury's finding after being given the instruction to find negligence only if a defendant's act was contemporaneous with Murillo's injury—an instruction sought by the *defendants* over Murillo's objection that it was not part of the pattern jury charge on negligence. Likewise, the en banc majority's legal finding that Oncor had no duty of ordinary care arising out of Oncor's control over an aspect of the manner in which Murillo did his work contradicts the *defendants*' insistence that this definition of control be included in the charge to the jury to describe the duty owed by the defendants to Murillo. And the en banc majority's legal conclusion that there is *no evidence* to support the jury's findings on the questions of control and duty depends entirely upon its substituting these *rejected* instructions and definitions into the charge in place of

9

those actually submitted and ruling on *that* charge—not on the one submitted, as required by the standard of review of jury charge error.

I would measure the sufficiency of the evidence to support Murillo's claims by the charge that was actually given, not by the charge the defendants sought to substitute for it. And I would hold that the evidence, viewed in the light most favorable to Murillo, as required by the appellate standard of review, is both legally and factually sufficient to support the jury's findings that Oncor controlled the distribution of electricity to the transformer where Murillo was injured during the utility removal process; that it owed both a contractual and a common-law duty to use ordinary care in distributing electricity to that transformer to prevent electrical injury to persons, like Murillo, engaged in utility removal activities; and that it negligently breached that duty, directly and foreseeably causing the injuries suffered by Murillo. Thus, I would hold that the jury properly found Oncor liable to Murillo for its ongoing negligent activity and properly awarded Murillo damages against Oncor for his injuries. Finding no error in the charge, I would therefore affirm the trial court's judgment.

## Background

Because I believe the proper disposition of this case requires consideration of facts the en banc majority opinion omits as immaterial, I have recited below

those sections of the record I find pertinent to support the jury's findings and to show the objections made to the charge below.

## A.    The Evidence at Trial

As the en banc majority recites, Oncor owned electricity transformers on property owned by Next Block, which planned to demolish the existing structures in order to redevelop the property. Next Block retained HRC-MJR Development, LLC ("HRC-MJR"), and its affiliate, Hunt Realty Investments, Inc. ("HRI"), to provide development management services for the property. HRC-MJR assigned its employee, Scott Shipp, to be the manager for the project.

In March 2007, Next Block and Oncor entered into a series of Discretionary Service Agreements ("DSAs") in which Oncor charged Next Block a "facilities relocation/removal charge" for the "partial removal of dist[ribution] Services to apt. properties." The agreements terminated upon "completion of removal." The agreements identified Scott Shipp as the Next Block company customer representative, and they required customer notification to him in care of HRC-MJR. The record indicates that, before June 2007, Shipp paid Oncor for the removal of all of its transformers.

The first stage of the property redevelopment project involved asbestos abatement, which required the use of some temporary electricity poles and meters installed by Oncor. This was followed by the demolition of the old apartment

buildings on the site and the removal of all improvements, including Oncor's poles, meters, transformers, and all other utilities, from the site. Basic Industries, Inc., the general contractor, and AAA, an independent-contractor salvage company and Murillo's employer, cleared the land for five of the nine apartment complexes scheduled to be demolished. The Windfall Apartments was the last complex to be cleared.

In April 2007, Oncor sent its workmen to the site to install a temporary pole with two meters and with cables running to its transformers on Pad A and Pad B to distribute electricity to the final part of the project during the asbestos abatement process. In May, the transformer on Pad A malfunctioned, and Oncor sent a crew to disconnect the electricity running to the transformers on Pad A, leaving energized only the two cables on the pole that serviced the transformers on Pad B.

The contractors completed the asbestos abatement work in early June, and, on June 7, Shipp requested that Oncor "please cancel the Continuing Service Agreements (CSA's) for the following apartments as soon as possible due to their scheduled demolition: Windfall Apartments." Oncor responded on June 11: "Thank you for your fax. Per your request, CSA [for the Windfall Apartments] ha[s] been cancelled for you effective 6/11/07. If you need any of these properties turned off, please provide a list of those addresses or account numbers."

Oncor's work records dated June 12 indicate that, on that day, Oncor read the temporary meters on the site, closed service on them, de-energized the temporary utility pole, and removed the meters from the utility poles. But there were two electricity cables running to the transformers on Pad B, and Oncor failed to de-energize one of them. That cable remained energized, and Oncor continued to distribute electricity through it to the transformer after closing the account and during the utility removal process taking place on the site. Oncor did not identify and produce for deposition or trial the employee who de-energized the utility pole on June 12. It claimed that it could not find him. Oncor did not tell anyone that it had de-energized only one of the two live cables on the last utility pole or that it continued to distribute electricity to one of the transformers on Pad B during the transformer disconnection and removal operations after cancelling service to the site and removing the meters.

Oncor's maintenance and construction supervisor, James Booker, testified, wrongly, that there was only one cable connection between the transformers and the utility pole. His testimony indicated that he was generally unaware of Oncor's work on the worksite. By contrast, Larry Davis, another Oncor supervisor, testified that the utility pole at the site of the accident had two cables that had to be de-energized; and he stated that, although Booker might not have been aware of

13

that fact, all Oncor work crews had access to the plans that would show the number and types of cables involved in any service call.

Jason Hagmeier, an Oncor representative, testified that, although he was not involved in the physical removal of the transformers from these particular apartment buildings, he knew Oncor's standard procedure for removing the transformers. He testified that the same crew would de-energize the cables, remove them from the boxes, and then remove the metal boxes. Thus, the power would be de-energized and the boxes removed on the same day. Hagmeier testified regarding the wires that ran to each of the three boxes on the transformer pad. The customer, Next Block, owned the "service wire" that ran from the second box to the building, but all wires in the first and third boxes were owned and maintained by Oncor. He stated that the same crew that removed the transformer would pull whatever copper it could from the worksite because part of the crew's job "was to salvage our copper that was owned by Oncor out of the transformers."

However, Hagmeier and other witnesses also testified that Oncor's standard procedure of same-day de-energizing of the cables, salvage of the copper, and removal of the transformer boxes was *not* followed on this project. Shipp and Hagmeier both testified that there was no particular time frame during which Oncor was supposed to remove the transformers after being informed by Shipp that they were ready for removal. Shipp testified that "there was no time frame

provided by Oncor" and that Oncor "provide[s] these types of services when [it] can get to them." And Hagmeier testified that the removal of the transformers in this case was done pursuant to a DSA that did not provide a time frame for the removal. Hagmeier stated that he would inform Booker when a site was ready for a crew to remove the transformer, and Booker would schedule the crew, usually within six to seven weeks, depending on the existence of other, more urgent maintenance, weather, and other factors.

Murillo participated in the salvage of copper wiring from the electrical cables on the site as part of the AAA work crew under the supervision of Leo Gomez. Shipp testified that he told the contractors that Oncor's transformers were not within the scope of the demolition work and that no one but Oncor had the right to go into the transformer boxes. However, Shipp also testified that he had that conversation with Gomez, who was killed before trial and thus was not available to testify and could not respond to that testimony.

Murillo testified that he noticed Oncor employees in the demolition and utility removal area as the AAA crew did its work around the apartment complex; and he testified that the Oncor crews would approach the work site to remove the transformer boxes after the AAA crew had removed the cables. Murillo also testified that, as he and his co-workers approached the transformer cabinets to disconnect the cables and salvage their wiring, they would find the doors unlocked

15

and open. And he testified that when he approached the final set of transformers—the Pad B boxes—the exterior and interior cabinet doors were unlocked and open, just as they had been on the other transformer boxes on which AAA had worked. Murillo reached inside the left metal box on Pad B, using work gloves and holding a wrench, to disconnect the copper cable attached to the transformer. The transformer was energized. Murillo suffered severe electrical injuries.

Oncor representative Hagmeier testified that he visited the pad site where Murillo was injured after the accident occurred. He noticed that the locks around the accident site had been cut and were lying on the ground, and he took a photograph of them. Hagmeier testified that on other occasions when he had met with Shipp at the job site he had noticed that the locks in another part of the complex were in place. He testified that the Oncor work crew had keys for the locks and that "when they go out there to work the job site, they unlock the locks themselves."

Neither Murillo nor Oncor presented evidence as to who had cut off the locks. However, Murillo testified that the locks on Pad A had been cut off a month earlier when he observed the boxes as police officers were arresting a person in front of them. And another Oncor employee, Keith Albanese, testified that, although he did not remember removing the temporary pole or de-energizing the utility pole he had previously re-energized to provide temporary power to the site,

16

he and other Oncor workers would cut locks with bolt cutters "if [he had] to" because he did not have a working key or because he had to remove "personal locks."

Following the accident, Murillo sued Oncor, along with five other defendants, including Basic, Next Block, and AAA, on a negligent activity theory of liability. He alleged that Oncor had controlled the distribution of electricity to the worksite during the demolition and utility removal process and that it had negligently failed to de-energize one of the electricity cables running to the transformers on Pad B on June 12, when it disconnected the remaining temporary service to the Windfall Apartments after previously disconnecting the temporary service to Pad A. Murillo further alleged that Oncor continued to distribute electricity to that transformer after the service contract was canceled. Oncor conceded at trial that it had not de-energized the Pad B transformer.

### B.    The Jury Charge

The case was submitted to the jury on a broad-form negligent activity theory of liability as to all defendants over the defendants' objections that it should be submitted, instead, on a premises defect theory.

#### 1.    *The General Negligence Charge Submitted to the Jury*

In the "Definitions" section of the jury charge, "negligence" was defined as "failure to use ordinary care"; "ordinary care" was defined as "that degree of care

17

that would be used by a person of ordinary prudence under the same or similar circumstances"; and "proximate cause" was defined in two parts as (1) "a substantial factor that brings about an event and without which the event would not have occurred" and as (2) "foreseeable," i.e., as meaning that "a person using ordinary care would have reasonably anticipated that his acts or failure to act would have caused the event or some similar event."[1] The jury was instructed that "[t]here may be more than one proximate cause of an event."

The jury was asked in Question No. 3 whether the listed defendants "exercise[d] or retain[ed] some control over the manner in which Marco Murillo's work in the transformer was performed, other than the right to order the work to

---

[1]  These are the definitions of "negligence," "ordinary care," and "proximate cause" set out in the Texas Pattern Jury Charges ("PJC"). *See* Comm. on Pattern Jury Charges, State Bar of Tex., *Tex. Pattern Jury Charges: General Negligence & Intentional Personal Torts* PJC 2.1 (2012). The comment to PJC 2.1 states that these definitions "should be included in the court's charge in every case in which ordinary negligence is the standard of care. They include the standard and accepted elements of negligence." *Id.* PJC 2.1 cmt. (citing *Colvin v. Red Steel Co.*, 682 S.W.2d 243, 245 (Tex. 1984)).

PJC 2.4 defines "proximate cause":

> a cause that was a substantial factor in bringing about an event, and without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a person using *ordinary care* would have foreseen that the event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of an event.

*Id.* PJC 2.4.

start or stop or to inspect progress or receive reports." The jury was instructed to answer Question No. 4 only if it answered "Yes" to Question No. 3 for the listed defendants.

The jury was asked in Question No. 4 whether any of the listed defendants' negligence "proximately cause[d] the injury in question."[2] The jury was instructed to answer "Yes" as to a listed defendant "only if [it found] that Marco Murillo was injured by or as a contemporaneous result of some activity of that person or entity." The jury was also instructed that it should assign percentages of responsibility only to those defendants it found "caused or contributed to cause the injury in Question 4." The percentages of responsibility the jury assigned to the defendants it found negligent were set out in its responses to Question No. 6 and damages were awarded in the remaining questions.

## 2. The Defendants' Objections to the Charge

Oncor objected at the charge conference that there was no evidence of its negligence or of proximate cause to support the submission of the case against it to the jury on a general negligence theory. It also joined in the request of its co-

---

[2] Question No. 4 reflects PJC 4.1, "Broad Form—Joint Submission of Negligence and Proximate Cause," which provides: "Did the negligence, if any, of those named below proximately cause the [*occurrence*] [*injury*] [*occurrence or injury*] in question?" *Id.* PJC 4.1. The question form provides for the jury to answer "Yes" or "No" with respect to listed defendants. Question No. 4 also used the definitions of "negligence" and "ordinary care" set out in PJC 2.1, "Negligence and Ordinary Care."

defendant Basic for a question on control, which became Question No. 3. Next

Block, however, sought to define control in Question No. 3 in terms of control on a

premises defect theory of liability and to predicate Question No. 4 on Question No.

3.[3] Murillo agreed to submission of the control question only in terms of the

---

[3]    Question No. 3 reflects PJC 66.14, regarding a "Property Owner's Liability to Contractors, Subcontractors, or Their Employees (Tex. Civ. Prac. & Rem. Code ch. 95)," which provides, "Did *Olivia Owner* exercise or retain some control over the manner in which [*the injury-causing*] [*the defect-producing*] work was performed, other than the right to order the work to start or stop or to inspect progress or receive reports?" Comm. on Pattern Jury Charges, State Bar of Tex., *Tex. Pattern Jury Charges: Malpractice, Premises & Products* PJC 66.14 (2012). The jury should be given the opportunity to answer "Yes" or "No." *Id.*

When a case is submitted on a premises liability theory of recovery, PJC 66.14 provides that the negligence question be predicated on the control question. *See id.* The negligence question then becomes:

> Did the negligence, if any, of *Olivia Owner* proximately cause the [*occurrence*] [*injury*] [*occurrence or injury*] in question?
>
> With respect to the condition of the premises, *Olivia Owner* was negligent if—
>
> > 1. *the condition* posed an unreasonable risk of harm, and
> > 2. *Olivia Owner* had actual knowledge of the danger, and
> > 3. *Olivia Owner* failed to exercise ordinary care to protect *Paul Payne* from the danger, by both failing to adequately warn *Paul Payne* of *the condition* and failing to make that condition reasonably safe.
>
> "Ordinary care," when used with respect to the conduct of *Olivia Owner* as an owner of a premises, means that degree of care that would be used by an owner of ordinary prudence under the same or similar circumstances.

*Id*.

20

defendants' control over an aspect of the manner in which Murillo performed his work in the transformer, rather than in terms of control of the premises.

Oncor also joined Basic in requesting that Question No. 4 include premises defect instructions, specifically an instruction that, "[w]ith respect to the condition of the premises," the listed defendants were negligent if (1) "[t]he condition posed an unreasonable risk of harm," (2) the defendant entity "had actual knowledge of the danger," and (3) the defendant "failed to exercise ordinary care to protect Marco Murillo from the danger, by both failing to adequately warn Marco Murillo of the condition and failing to make that condition reasonably safe." Oncor similarly joined Basic's request that instructions on Murillo's status as licensee, invitee, or trespasser be added to Question 4. And it joined Basic's request that an instruction be added to Question No. 4 that would give the jurors "the opportunity to answer as to whether or not Mr. Murillo's injuries were caused by or as a

---

The comment to PJC 66.14 provides:

> **When to use.** PJC 66.14 should be used in cases governed by chapter 95 of the Texas Civil Practice and Remedies Code, which applies when a property owner is claimed to be liable for personal injury, death, or property damage to a contractor, a subcontractor, or an employee of a contractor or subcontractor arising from the condition or use of an improvement to real property where the contractor or subcontractor constructs, repairs, renovates, or modifies the improvement. Under the statute, the property owner is not liable unless he controlled the manner in which the work was performed and knew of the harm and failed to adequately warn of it.

*Id.* PJC 66.14 cmt. (citing TEX. CIV. PRAC. & REM. CODE § 95.003 (Vernon 2011)).

contemporaneous result of any activity of the defendant." These instructions reflected the pattern jury charge on a property owner's liability to contractors, subcontractors, and their employees provided for in Texas Civil Practice and Remedies Code Chapter 95 and set out in Pattern Jury Charge ("PJC") 66.14.

Murillo objected to the defendants' attempt to insert the premises defect elements into Question No. 3 in defining the duty of control of the defendants and into Question No. 4 as instructions on the primary question on negligence. He argued that the defendants' premises defect theory of liability was an affirmative defense to his own negligent activity theory of liability. Therefore, he argued, it could "only be submitted by an affirmative defense instruction, not in the primary negligence question." Murillo further objected that the defendants had "not asked for an affirmative defense instruction pursuant to PJC Chapter 3" and that "[t]hey are only allowed to submit affirmative defenses by instruction, not questions. And the PJC does have the appropriate language."[4] He reiterated: "They are not

---

[4] Chapter 3 of the Pattern Jury Charges on general negligence "contains the inferential rebuttal instructions to submit if raised by the evidence." Comm. on Pattern Jury Charges, State Bar of Tex., *Tex. Pattern Jury Charges: General Negligence & Intentional Personal Torts* ch. 3 note (2012). The list of inferential rebuttal questions includes "new and independent cause," "sole proximate cause," "emergency," "unavoidable accident," and "act of God." *Id.*

The note to Chapter 3 also states: "A number of traditional defensive or rebuttal theories once submitted as special issues are now subsumed under the comparative negligence question and are no longer submitted to the jury. These include . . . 'no duty' and 'open and obvious' in premises cases." *Id.* (citing *Parker v. Highland*

allowed to assert affirmative defenses by questions, which is what they are doing in question number 3, and then predicating to question number 4."

Murillo also objected to the submission of instructions on Murillo's status as a licensee, invitee, or trespasser—instructions appropriate to a premises defect theory of liability—with Question No. 4 on the ground that "the plaintiff's status is irrelevant, given the facts of the case," and "for all the reasons I stated just a short while ago regarding the premises liability and when it applies pursuant to PJC 66.3" when "none of those [elements] apply in this case." And he objected to an instruction on contemporaneous activity in Question 4 on the ground that "Question number 4 is the general negligence question. The PJC does not authorize this definition to be submitted along with the general negligence question."

Oncor also joined Next Block's attempt to add the premises defect elements set out in Civil Remedies and Practice Code Chapter 95 to Question No. 4, which Next Block accompanied by the statement, "We are real close on getting this case submitted under Chapter 95." And Murillo again objected that "the injury-causing

---

*Park, Inc.*, 565 S.W.2d 512, 520–21 (Tex. 1978), and *Massman-Johnson v. Gundolf*, 484 S.W.2d 555, 556–57 (Tex. 1972)).

The note further provides, "These theories should not be submitted by either question or instruction." *Id*. And it continues, "The Texas Supreme Court has also cautioned that 'giving multiple instructions on every possible rebuttal inference has the potential to skew the jury's analysis.'" *Id*. (citing *Dillard v. Tex. Elec. Coop.*, 157 S.W.3d 429, 433 (Tex. 2005)).

event is not what they are saying as a part of their affirmative defense," i.e., breach of the duty of a premises owner to warn of dangers of which it is aware or, alternatively, Murillo's own trespass in the transformer box, both of which the defendants attempted to insert into Question No. 4 in place of the submission of a general negligence question as defined in Question No. 4.  Both were alleged as alternative, hence as new and independent, causes of Murillo's injury, intended to inferentially rebut Murillo's theory of the case.[5]  Murillo insisted that "if they are

---

[5]    The "Inferential Rebuttal Instructions" section of the Pattern Jury Charges, in PJC 3.1, "New and Independent Cause," defines "proximate cause" differently from the definition set out in PJC 2.4, which was the jury instruction used in this case. Rather, PJC 3.1 adds a definition of "new and independent cause."  It provides:

> "Proximate cause" means a cause, unbroken by any new and independent cause, that was a substantial factor in bringing about an event, and without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a person using *ordinary care* would have foreseen that the event, or some similar event, might reasonably result therefrom.  There may be more than one proximate cause of an event.

> "New and independent cause" means the act or omission of a separate and independent agency, not reasonably foreseeable, that destroys the causal connection, if any, between the act or omission inquired about and the occurrence in question and thereby becomes the immediate cause of such occurrence.

Comm. on Pattern Jury Charges, State Bar of Tex., *Tex. Pattern Jury Charges: General Negligence & Intentional Personal Torts* PJC 3.1 (2012).

The comment to PJC 3.1 provides: "PJC 3.1 should be used in lieu of the usual definition of 'proximate cause' (see PJC 2.4) if there is evidence that the occurrence was caused by a new and independent cause.  Submission if there is no

going to be allowed to submit these questions, we need to do it right," namely by keeping the injury-causing event as "what I have pled and proved," i.e., negligence, and "then let . . . whatever their theory of the case is . . . be part of the affirmative defense." Again he repeated, "This is a direct negligence case with respect to this defendant. . . . [T]hey are inserting their affirmative defense into the negligence questions."

The trial court overruled the defendants' objections to Questions Nos. 3 and 4, and it refused to add to Question No. 4 the written instructions on the premises defect elements that the defendants proffered. The court accepted the control question proffered by the defendants, which became Question No. 3. It accepted the defendants' request that the jury be instructed to answer Question No. 4, the broad-form negligence question on liability, with respect to a defendant only if it answered "yes" to Question No. 3, finding that that defendant exercised some control over the manner in which Murillo did his work in the transformer box.

such evidence is improper and may be reversible error." *Id*. PJC 3.1 cmt. (internal citations omitted).

The comment further provides:

> Because a new and independent cause is in the nature of an inferential rebuttal, it should be submitted by instruction only. TEX. R. CIV. P. 277. . . . The "new and independent cause" instruction is not used when the intervening forces are foreseeable and within the scope of risk created by the actor's conduct. *Dew v. Crown Derrick Erectors, Inc.*, 208 S.W.3d 448, 450–53 (Tex. 2006).

*Id*.

25

And it accepted the defendants' request that the jury be instructed in Question No. 4 only if it found that "Murillo was injured by or as a contemporaneous result of some activity of that person or entity."

The charge was thus submitted to the jury on a general negligence theory of liability. The defendants did not seek to present their premises defect theory of liability via inferential rebuttal instructions as provided in Chapter 3 of the Texas Pattern Jury Charges—General Negligence. They sought to submit them solely *instead of* Murillo's theory.

### 3.    *The Jury's Findings*

The jury found, in response to Question No. 3, that Oncor "exercise[d] or retain[ed] some control over the manner in which Marco Murillo's work in the transformer was performed, other than the right to order the work to start or stop or to inspect progress or receive reports." The jury also found, in response to Question No. 4, that Oncor's negligence "proximately cause[d] the injury in question." It found Oncor 60% responsible for having "caused or contributed to cause the injury in [Question No.] 4," and it assessed total damages of $7,770,000.

The trial court entered judgment on the verdict. Oncor appealed.

**Oncor's Liability to Murillo**

In its first and second issues, Oncor argues that the case against it was incorrectly submitted to the jury on a negligent activity theory of liability rather

than on a premises defect theory, that Murillo failed to state a claim against it on a negligent activity theory, and that the evidence is legally and factually insufficient to support the jury's findings regarding its control and negligence.

A.     **Liability of Premises Owner/Operator for Its Own Negligent Activity and for Premises Defect**

Premises owners and occupiers, such as Oncor, may be held liable for personal injuries caused by either (1) negligent activities of the owner or occupier or (2) unreasonably dangerous conditions on the premises. *See Timberwalk Apartments, Partners, Inc. v. Cain*, 972 S.W.2d 749, 753 (Tex. 1998).

The Texas Supreme Court has consistently recognized that negligent-activity claims and premises-defect claims against a property owner/occupier involve two independent theories of recovery that fall within the scope of negligence. *See Gen. Elec. Co. v. Moritz*, 257 S.W.3d 211, 214–16 (Tex. 2008). It has stated that although "[t]he lines between negligent activity and premises liability are sometimes unclear," there is a recognized distinction between the two theories. *Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 776 (Tex. 2010). And it has repeatedly "rejected attempts to blur the distinction between these two claims," much less to eliminate that distinction. *See State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006); *Keetch v. Kroger Co.*, 845 S.W.2d 262, 264 (Tex. 1992) (declining "to eliminate all distinction between premises conditions and negligent activities").

"Recovery on a negligent activity theory requires that the person have been injured by or as a contemporaneous result of the activity itself rather than by a condition created by the activity." *Timberwalk*, 972 S.W.2d at 753. A premises owner performing an *activity* on property it controls has a duty to use ordinary care so that its activity does not proximately cause foreseeable injury. *See Del Lago*, 307 S.W.3d at 777 (holding that premises owner had duty to use degree of care in *performing activities* that owner of ordinary prudence would use under same or similar circumstances); *Moritz*, 257 S.W.3d at 214; *West v. SMG*, 318 S.W.3d 430, 438 (Tex. App.—Houston [1st Dist.] 2010, no pet.) (holding same).

In a negligent activity case, "'ordinary care' means the 'degree of care that would be used by an owner or occupier of ordinary prudence under the same or similar circumstances,'" and the failure to use such care must proximately cause the plaintiff's injury. *Del Lago*, 307 S.W.3d at 777. Thus, "negligence" in the context of a negligent activity claim means doing or failing to do what a person of ordinary prudence in the same or similar circumstances would have not done or done. *Timberwalk*, 972 S.W.2d at 753.

Proximate cause requires both cause in fact and foreseeability, both of which must be established by the evidence. *W. Invs., Inc. v. Urena*, 162 S.W.3d 547, 551 (Tex. 2005); *see Del Lago*, 307 S.W.3d at 774 ("Proximate cause comprises two elements: cause in fact and foreseeability."). "Foreseeability exists if the actor, as

28

a person of ordinary intelligence, should have anticipated the dangers his negligent act created for others." *Aleman v. Ben E. Keith Co.*, 227 S.W.3d 304, 310 (Tex. App.—Houston [1st Dist.] 2007, no pet.). Cause in fact means that the defendant's act or omission was a substantial factor in bringing about the injury which would not otherwise have occurred. *See Del Lago*, 307 S.W.3d at 774; *Urena*, 162 S.W.3d at 551 ("The test for cause in fact is whether the act or omission was a substantial factor in causing the injury without which the harm would not have occurred."). "If the defendant's negligence merely furnished a condition that made the injury possible, there can be no cause in fact." *Urena*, 162 S.W.3d at 551. There may be more than one proximate cause of an occurrence. *Del Lago*, 307 S.W.3d at 774.

Unlike a negligent activity claim, a premises defect claim is not based on the defendant's *malfeasance*, but on its *nonfeasance*. *Id.* at 776. That is, "a premises defect claim is based on the *property itself* being unsafe," not on the defendant's activity. *Shumake*, 199 S.W.3d at 284 (emphasis added). Negligence in the premises defect context thus means "failure to use ordinary care to reduce or eliminate an unreasonable risk of harm created by a premises condition which the owner or occupier [of land] knows about or in the exercise of ordinary care should know about." *Timberwalk*, 972 S.W.2d at 753 (quoting *Keetch*, 845 S.W.2d at 264); *see Del Lago*, 307 S.W.3d at 787–88 (holding that negligence in premises

29

defect context generally means failure to use ordinary care to reduce or eliminate unreasonable risk of harm created by premises condition about which owner or occupier of land is aware). In such circumstances, the property owner has a duty to "either adequately warn of the dangerous condition or make the condition reasonably safe." *Del Lago*, 307 S.W.3d at 771 (quoting *TXI Operations, L.P. v. Perry*, 278 S.W.3d 763, 765 (Tex. 2009)).

Cases brought against a property owner/occupier either on a negligent activity theory or on a premises defect theory incorporate the elements of *control* and *duty*. But control and duty are defined differently for these two theories of liability.

In *Moritz*, the supreme court explained the concept of control in a negligent activity case, stating:

> Generally, an owner or occupier does not owe a duty to ensure that independent contractors perform their work in a safe manner. But one *who retains a right to control the contractor's work may be held liable for negligence in exercising that right.* This right to control may be expressed by contract or implied by conduct. . . .
>
> [A] defendant's duty "*is commensurate with the control it retains* over the independent contractor's work." Thus, it is not enough to show that the defendant controlled one aspect of [the plaintiff's] activities if his injury arose from another.

*Moritz*, 257 S.W.3d at 214 (quoting *Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 783 (Tex. 2001)) (emphasis added in *Moritz*). This duty was adopted into Texas law from the Restatement (Second) of Torts section 414, which provides:

> One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.

*Harrison*, 70 S.W.3d at 783 (quoting RESTATEMENT (SECOND) OF TORTS § 414 (1965)); *see also Redinger v. Living, Inc.*, 689 S.W.2d 415, 417 (Tex. 1985).

The right to control may be shown either by explicit contractual assignment, which is generally a question of law for the court, or by the actual exercise of control, which is generally a question of fact for the jury. *Shell Oil Co. v. Khan*, 138 S.W.3d 288, 292 (Tex. 2004); *see also Harrison*, 70 S.W.3d at 783 (holding that duty to ensure that independent contractor performs its work in safe manner arises "if the general contractor retains some control over the manner in which the independent contractor performs its work").

The *Moritz* court distinguished the duty of a premises owner/occupier in a premises defect case from the duty of a premises owner who retains control over any part of the work on a worksite for the safety of those working there, stating:

> Generally, *a landowner is liable* to employees of an independent contractor *only for claims arising from a pre-existing defect* rather than from the *contractor's* work, and then only if the pre-existing defect was concealed: "With respect to existing defects, an owner or occupier has a duty to inspect the premises and warn of *concealed* hazards the owner knows or should have known about." . . . *[T]he landowner's duty is limited [to concealed hazards] because control is being turned over to someone else*. . . .

31

257 S.W.3d at 215 (quoting *Khan*, 138 S.W.2d at 295) (emphasis added); *see Cnty. of Cameron v. Brown*, 80 S.W.3d 549, 556 (Tex. 2002) (concluding, for purposes of premises defect liability claim, that county assumed sufficient control over state-owned causeway because it had maintenance contract with state that included responsibilities over causeway's streetlight system and holding that "[t]he relevant inquiry is whether the defendant assumed sufficient control over the part of the premises that presented the alleged danger so that the defendant had the responsibility to remedy it").

Here, Question No. 3 in the jury charge asked whether the listed defendants, including Oncor, "exercised[d] control over the manner in which Marco Murillo's work in the transformer was performed." Question No. 4 asked whether any of the listed defendants were negligent. "Negligence" was defined as "failure to use ordinary care"; "proximate cause" was defined as "a substantial factor that brings about an event and without which the event would not have occurred"; and an occurrence was described as "foreseeable" if "a person using ordinary care would have reasonably anticipated that his acts or failure to act would have caused the event or some similar event."

The trial court thus submitted the case to the jury on Murillo's negligent activity theory of liability and not on the defendants' premises defect theory, and the charge reflects the pattern jury charge for submission of a general negligence

case to the jury on a broad-form liability question. Therefore, in my view, this Court should have reviewed the sufficiency of the evidence to support the jury's findings that Oncor had a duty to use ordinary care in exercising control over the distribution of electricity to the transformer where Murillo was injured while doing his work and that it breached that duty by its contemporaneous negligent activity, directly and foreseeably causing Murillo's injuries. But it did not. If it had done so, it would necessarily have concluded that the evidence was both legally and factually sufficient to support the jury's findings regarding Oncor based on the negligence theory of liability submitted to it.

**B.    Legal and Factual Sufficiency of the Evidence to Support the Jury's Verdict**

*1.    Standard of Review*

In reviewing the legal sufficiency of the evidence, we must view the evidence in the light most favorable to the verdict, crediting favorable evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. *See City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005); *Tiller v. McLure*, 121 S.W.3d 709, 713 (Tex. 2003) (holding that, in reviewing "no evidence" point, court views evidence in light that tends to support finding of disputed fact and disregards all evidence and inferences to contrary). To sustain a challenge to the legal sufficiency of the evidence to support a jury finding, we must find that: (1) there is a complete lack of evidence of a vital fact; (2) the court is

barred by rules of evidence or law from giving weight to the only evidence offered to prove a vital fact; (3) there is no more than a mere scintilla of evidence to prove a vital fact; or (4) the evidence conclusively established the opposite of a vital fact. *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 903 (Tex. 2004). "The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *Del Lago*, 307 S.W.3d at 770 (quoting *Wilson*, 168 S.W.3d at 827).

In reviewing a challenge to the factual sufficiency of the evidence, we "must consider and weigh all the evidence and should set aside the judgment only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Arias v. Brookstone, L.P.*, 265 S.W.3d 459, 468 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) (citing *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986)). The fact finder is the sole judge of witnesses' credibility; it may choose to believe one witness over another, and a reviewing court cannot impose its own opinion to the contrary. *Wilson*, 168 S.W.3d at 819; *Arias*, 265 S.W.3d at 468. Because it is the fact finder's province to resolve conflicting evidence, we must assume that it resolved all conflicts in accordance with the verdict if reasonable persons could do so. *Wilson*, 168 S.W.3d at 819; *Arias*, 265 S.W.3d at 468. When an appellant attacks the factual sufficiency of an adverse finding on an issue on which it did not have the burden of proof, the appellant must demonstrate that the

finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *See Cain*, 709 S.W.2d at 176.

## 2. *Sufficiency of the Evidence to Support the Jury's Findings*

The evidence shows that Oncor's involvement with the demolition and utility removal project went far beyond its merely distributing electricity through its electric cables and transformers to its customer, Next Block, under an electricity provider's contract. It shows that Oncor both contractually and actually retained control of the safe distribution of electricity to its transformers on the worksite until "the completion of removal" of all utilities from the site. Oncor not only generally controlled the safe distribution of electricity to Next Block; it retained control over the safety conditions of Murillo's and others' work in the demolition and utility removal process in general and in the transformer on Pad B in particular. It therefore had a duty, commensurate with that retention of control, to use ordinary care to ensure that electricity would not be running through a live cable when Murillo, or anyone else, entered the transformer box on Pad B to disconnect the cable as part of the salvage and removal process.

It is undisputed that the Oncor work crew did not disconnect the electricity to one of the transformers on Pad B on June 12 when it went to the site to disconnect the electricity to that area, including neighboring Pad A, so that removal of the electrical utilities from the demolished Windfall Apartments could

35

proceed safely. And it is undisputed that Oncor continued to distribute electricity to that cable to the transformer on Pad B over the next six weeks, creating a dangerous risk of electrocution for any worker who entered the transformer box to disconnect the cable so that the transformer could be removed from the site.

There was also sufficient evidence from which the jury could reasonably have concluded that the customary practice on the site was for AAA and Murillo—not Oncor's own workers—to disconnect the deactivated electricity cables from the transformers inside the unlocked and open transformer boxes whenever they got to them so that they could salvage the copper wiring in the cables and Oncor could then remove its cables and transformers from the site. Although some Oncor employees testified that Oncor's customary practice was to disconnect its own electricity cables, salvage their materials, and remove the transformers themselves all on the same day, this testimony was contradicted by that of Hagmeier, Davis, and other Oncor employees who testified that Oncor's standard procedure for de-energizing and removing the transformers from the worksite was not followed on this project. Shipp and Oncor employees testified that Oncor did not commit to a particular time frame for completing the removal of the transformers, but that the work was usually done within six to seven weeks, depending on the existence of other, more urgent maintenance, weather, and other factors. This evidence must be

viewed in the light most favorable to Murillo and the contrary evidence disregarded. *See Wilson*, 168 S.W.3d at 822.

Likewise, although some Oncor employees testified that the transformer boxes were always kept locked, Oncor employee Albanese testified to cutting off locks on the transformers with bolt cutters when he "had to," and Murillo testified that when he reached each transformer box, the locks were already removed and he did not remove the locks himself. Murillo also testified that, on numerous previous occasions during the utility removal process, Oncor employees waited for Murillo and the AAA crew to unbolt the cables from the transformers before they lifted and hauled away Oncor's transformer boxes. This evidence too must be viewed in the light most favorable to Murillo, not Oncor, and all contrary evidence disregarded. *See id.*

Viewing the evidence in the light most favorable to the verdict, as the standard of appellate review requires, I would conclude, on the basis of this record, that the evidence was legally and factually sufficient to support the jury's finding, in response to Question No. 3, that Oncor "retain[ed] some control over the manner in which Marco Murillo's work in the transformer was performed" as the party that controlled the flow of electricity to the transformer on Pad B during the cable disconnection, material salvage, and utility removal process, in the course of which Murillo was injured.

37

I would also conclude that the evidence is sufficient to support the jury's finding, in response to Question No. 4, that Oncor had a duty of ordinary care that it breached by negligently failing to de-energize both cables running from the utility pole servicing the transformer on Pad B when it sent a crew to the site for that purpose and by negligently continuing to distribute electricity to the transformer on Pad B through that cable during the utility removal process after it closed Next Block's account, directly and foreseeably causing Murillo to be severely injured when he entered the transformer box on Pad B to disconnect it. *See Del Lago*, 307 S.W.3d at 777 (premises owner had duty to use degree of care in performing activities that would be used by owner or occupier of ordinary prudence under same or similar circumstances).

The jury was the sole judge of the witnesses' credibility and alone was charged with resolving conflicting evidence; it was entitled to believe one witness over another; and this Court cannot impose its own opinion to the contrary. *See Wilson*, 168 S.W.3d at 819. Because it was the jury's province to resolve conflicting evidence, we must assume that it resolved all conflicts in accordance with the verdict if reasonable persons could do so. *See id.* Viewing the evidence in the light most favorable to Murillo, I would conclude that the evidence of Oncor's negligence was such that reasonable and fair-minded people could have reached the verdict under review and that the evidence was, therefore, legally

sufficient. *See Del Lago*, 301 S.W.3d at 770; *Wilson*, 168 S.W.3d at 827. Likewise, I would conclude that the jury's findings on Oncor's liability were not so contrary to the weight of the evidence as to make them clearly wrong and unjust, and therefore the evidence was also factually sufficient to support the verdict. *See Arias*, 265 S.W.3d at 468.

The en banc majority, however, construes Oncor's duty to be the duty of a premises owner in a premises defect case to inspect the premises and warn of or remedy hidden dangers. Thus it does not address the sufficiency of the evidence to support the charge the jury was given. Without considering the duty of a premises owner/occupier to use ordinary care in exercising control it has retained over an aspect of the manner in which a workman's work is safely performed, the en banc majority denies that there is any evidence that Oncor had any duty to Murillo other than the duty of a premises owner to the general public. It opines, "Murillo points to no evidence that Oncor was obligated to de-energize its transformer, that it had been instructed to do so, or that it verified to anyone associated with the project the Pad B transformer was either energized or de-energized." Slip Op. at 19. But this is not a correct representation of the record, as Murillo does point to such evidence, as discussed above.

The en banc majority also opines, "No evidence supports the jury's finding that Oncor exercised or retained any control over Murillo's work," supporting this

39

claim with the statement that "Oncor employees never even spoke to anyone on the AAA crew." *Id.* But testimony by an Oncor employee that Oncor employees never spoke to anyone on the AAA crew is irrelevant to the question of whether Oncor had and breached a duty of ordinary care in controlling the distribution of electricity to the transformer on Pad B where Murillo was electrically injured while performing his material salvage tasks. And it ignores the evidence cited above of Oncor's contractual assumption of ongoing control over the distribution of electricity to the site until "the completion of removal" of utilities—including its meters, electricity cables, transformers, and transformer boxes—from the property and its actual control of the distribution of electricity to maintain safe working conditions during the utility removal operations on the worksite, in the course of which Murillo was injured.

Finally, the en banc majority claims that "Oncor did not contemporaneously energize the transformer while Murillo worked, or tell anyone at the worksite that it had been switched off when in fact it was not." And it concludes, "Without evidence of such acts, Oncor, as an electricity provider, had no general duty to recognize and prevent electrical contact during a construction project." Slip Op. at 20. But Murillo never claimed that Oncor energized the transformer while he was working. He claimed, and the evidence clearly showed, that Oncor failed to *de-energize* the transformer on Pad B on June 12 and *continued* to distribute

40

electricity to it over the next six weeks during the utility removal project for which it had agreed to control the electricity. Nor was the negligence question submitted to the jury on a theory of Oncor's duty as an electricity provider to recognize and prevent electrical contact. Questions 3 and 4 asked whether Oncor (like the other defendants) had "exercise[d] . . . some control over the manner in which Marco Murillo's work in the transformer was performed" and whether its negligence "proximately cause[d] the injury in question" as "a contemporaneous result of some activity that of that . . . entity."

I find the evidence more than sufficient to support the jury's findings of Oncor's liability on a general negligence theory when the evidence is viewed in the light most favorable to Murillo, as it must be. The en banc majority's determination that the evidence is insufficient to support *Oncor's* theory of the case when the evidence is viewed in the light most favorable to *Oncor* on an *unsubmitted charge* is immaterial to the charge as given. Therefore, I turn to the en banc majority's argument that the charge was improperly submitted on broad-form negligence and that the judgment of the trial court on the jury's verdict must be overturned as a matter of law and judgment rendered in favor of Oncor.

**Jury Charge Error**

In its third issue, Oncor contends that Murillo's exclusive remedy against it was to bring a premises defect liability claim under the Civil Practice and

41

Remedies Code Chapter 95. It also contends that Murillo waived that claim by not securing findings on the essential elements of a premises defect claim against a property owner set out in Chapter 95, including Oncor's control of the premises and its actual knowledge and failure to warn of the dangerous condition that caused the plaintiff's injury. Oncor argues that, as a defendant on a premises defect liability theory, it was entitled to the standard premises defect jury instructions defining its duty to Murillo in a way that would have allowed the jury to consider its warnings to those who came near its energized transformers and the reasonable efforts it made to keep its premises safe. It therefore contends that judgment must be rendered in its favor. The en banc majority agrees and renders judgment in favor of Oncor.

The en banc majority, accepting Oncor's argument, holds that the case as to Oncor could only have been submitted to the jury as a case against an occupier of land for failure to warn of or remedy an existing hidden defect of which it knew and not as a negligent activity case. Thus, it holds that the trial court committed harmful error by failing to submit to the jury instructions defining Oncor's duty to Murillo in a way that would have allowed the jury to consider Oncor's warnings to those who came near its energized transformers and the reasonable efforts it made to keep its premises safe. That is, it holds that the trial court erred in failing to substitute the defendants' theory of liability for Murillo's and, therefore, the

42

judgment must be reversed and rendered in favor of Oncor. In my view, in so doing, the en banc majority accepts the defendants' invitation to "blur the distinction" between negligent activity and premises defect liability, and, indeed, to eliminate the latter as a theory of liability for a premises owner/occupier in direct contravention of the Texas Supreme Court's directives in *Del Lago*, *Shumake*, and *Keetch*; and it implicitly invites the supreme court to overrule those cases. *See Del Lago*, 307 S.W.3d at 776; *Shumake*, 199 S.W.3d at 284; *Keetch*, 845 S.W.2d at 264.

I therefore turn to whether there was reversible error in the charge and what it means to both premises liability law and the law governing jury charge error to conclude that there was.

### A. The Jury Charge in Negligence and Premises Defect Cases

Texas Rule of Civil Procedure 277 mandates broad-form submission of jury questions "whenever feasible." TEX. R. CIV. P. 277. The trial court has considerable discretion in determining proper jury instructions. *Thota v. Young*, 366 S.W.3d 678, 687 (Tex. 2012). "An instruction is proper if it (1) assists the jury, (2) accurately states the law, and (3) finds support in the pleadings and evidence." *Id.* (quoting *La.-Pac. Corp. v. Knighten*, 976 S.W.2d 674, 676 (Tex. 1998)).

When a trial court submits a defective issue to the jury without objection, the appellate court reviews the sufficiency of the evidence against the questions and instructions that were actually given; not against questions and instructions never requested. *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000). An appellate court does not reverse a judgment for charge error unless the error was harmful "because it 'probably caused the rendition of an improper judgment' or 'probably prevented the petitioner from properly presenting the case to the appellate courts.'" *Thota*, 366 S.W.3d at 687 (quoting TEX. R. APP. P. 44.1(a), 61.1).

### 1. *Submission of the Charge in Negligent Activity and Premises Defect Cases*

As in other cases, a trial court has great discretion in submitting the jury charge in negligent activity and premises defect cases. *Tex. Dep't of Transp. v. Ramming*, 861 S.W.2d 460, 463 (Tex. App.—Houston [14th Dist.] 1993, no writ); *see Thota*, 366 S.W.3d at 687. This discretion is subject to Rule 277's mandate of broad-form submission "whenever feasible." *Keetch*, 845 S.W.2d at 266; *see* TEX. R. CIV. P. 277. It is also "subject to the requirement that the questions submitted must control the disposition of the case, be raised by the pleadings and evidence, and properly submit the disputed issues for the jury's deliberation." *Ramming*, 861 S.W.2d at 463; *see* TEX. R. CIV. P. 278.

"Where . . . the alleged facts support . . . an on-going activity [or] contemporaneous injury theory, then the case need not be presented to the jury in

premises liability terms. Rather, a general negligence question is appropriate and sufficient." *Ramming*, 861 S.W.2d at 465.

In a premises defect case, as in a negligent activity case, "[t]he plaintiff may submit [the] cause of action to the jury through a question about the [defendant]'s right to control the defect-producing work, to establish a duty, and a broad-form negligence question." *Clayton W. Williams, Jr., Inc. v. Olivo*, 952 S.W.2d 523, 529 (Tex. 1997). However, in a premises defect case, unlike a negligent activity case, instructions incorporating the premises defect elements set out in *Corbin v. Safeway Stores, Inc.*, 648 S.W.2d 292 (Tex. 1983), must accompany the questions. *Id.*

The supreme court explained the additional requirement of instructions in a premises defect case in *Corbin* by reference to the Restatement (Second) of Torts section 343, which, it stated, summarized "the duty of reasonable care that an occupier of premises owes to invitees." 648 S.W.2d at 295 (citing RESTATEMENT (SECOND) OF TORTS § 343 (1965)). This duty requires an occupier with "actual or constructive knowledge of any condition on the premises that poses an unreasonable risk of harm to invitees . . . to take whatever action is reasonably prudent under the circumstances to reduce or to eliminate the unreasonable risk from that condition." *Id.* The duty of an owner/occupier under a premises-defect theory of liability thus stands in clear contrast to the duty of an owner/occupier

45

under a negligence theory, which derives from a different section of the same Restatement (Second) of Torts, section 414. *See Harrison*, 70 S.W.3d at 783 ("One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care which is caused by his failure to exercise this control with reasonable care.") (quoting RESTATEMENT (SECOND) OF TORTS § 414 (1965)).

The *Corbin* court distinguished the duty of a premises occupier from "a simple negligence action," stating that "Section 343 simply tailors the traditional test of the conduct of a reasonably prudent person to a specific category of defendants, namely, premises occupiers." 648 S.W.2d at 295. Thus, "an occupier's liability to an invitee depends on whether he acted reasonably in light of what he knew or should have known about the risks accompanying a premises condition, not on whether a specific set of facts or a specific breach of duty is established." *Id.* Accordingly, the *Corbin* court set out the premises defect elements that distinguish a premises defect case against an owner/occupier from a general negligence case in which a specific set of facts and a specific breach of duty are established, namely, (1) "[a]ctual or constructive knowledge of some condition on the premises by the owner/operator" that (2) "posed an unreasonable risk of harm"; (3) the owner/operator's failure to "exercise reasonable care to

46

reduce or eliminate the risk"; and (4) proximate cause of the plaintiff's injuries. *Keetch*, 845 S.W.2d at 264 (quoting *Corbin*, 648 S.W.2d at 296).

Subsequently, in *Olivo*, after distinguishing the duty of a premises owner/occupier on a negligent activity theory from that of an owner/occupier on a premises defect theory, the supreme court held that "[b]ecause premises defect cases and negligent activity cases are based on independent theories of recovery, a simple negligence question, unaccompanied by the *Corbin* elements as instructions or definitions, cannot support a recovery in a premises defect case." 952 S.W.2d at 529.

Given these distinctions, I turn to whether the trial court erred by refusing to submit the case as to Oncor on a premises defect theory, as requested by the defendants, rather than on a general negligence theory, as requested by Murillo.

### 2.    *Propriety of the Negligent Activity Charge Submitted in This Case*

In my view, this case falls squarely under the law governing the negligent activity of a premises owner/occupier as set out in *Moritz*, *Kahn*, *Harrison*, and, most pertinently on the facts, *Ramming*—cases the majority fails to consider or addresses only to dismiss.

In *Ramming*, a car accident occurred at an intersection where the defendant's employee had turned off a traffic signal for maintenance and testing activities. *See* 861 S.W.2d at 463. The defendant, the Texas Department of Transportation

47

("TexDot"), was found negligent for its act of turning off the traffic signals at an intersection where its "test/maintenance activity was ongoing at the time of the accident," proximately causing the plaintiff to be injured. *Id.* at 465.

Just as here, the trial court in *Ramming* refused to submit requested premises-defect instructions to the jury along with its broad-form negligence question. It reasoned that a premises defect theory applies "when a traffic signal is functioning properly but then fails due to component failure, act of God, third party interference, or the non-contemporaneous act of [the property owner in control]." *Id.* In other words, a premises defect occurs when the defendant's negligent activity, or negligent exercise of its control over an aspect of the activities on the site, is *not* the cause in fact of the plaintiff's injury because it has turned over control to someone else. *See Del Lago*, 307 S.W.3d at 776 (premises defect claim is not based on defendant's malfeasance, but on its nonfeasance); *Moritz*, 257 S.W.3d at 215 ("[T]he landowner's duty is limited [to concealed hazards] because control is being turned over to someone else. . . ."); *Shumake*, 199 S.W.3d at 284 (stating that "a premises defect claim is based on the property itself being unsafe," not on defendant's activity); *Urena*, 162 S.W.3d at 551 (discussing causation and stating, "If the defendant's negligence merely furnished a condition that made the injuries possible, there can be no cause in fact").

In both *Ramming* and this case, the premises occupier's negligent activity was a direct and foreseeable cause of the plaintiff's injury. Like in *Ramming*, Murillo was not injured because a hidden dangerous condition occurred as a result of equipment failure, act of God, third party interference, or the non-contemporaneous act of the easement owner. Just as Ramming was injured when he entered the intersection because the defendant, TexDot, had shut off the light at that intersection while it performed maintenance and testing activities, so, here, Murillo was injured while working to disconnect a transformer to which Oncor had agreed to control the distribution of electricity during the utility removal process and to which it continued to control the electricity as Murillo and others disconnected the electricity cables, salvaged their wiring, and removed the transformers from the site.

Notably, the *Ramming* court specifically distinguished the seminal premises defect case of *Keetch v. Kroger Co.*, relied upon here by Oncor and the majority to show that this is a premises defect case and cannot be a negligent activity case. In *Keetch*, the Texas Supreme Court held that because there was no contemporaneous activity the case should have been submitted to the jury on a premises defect theory. 845 S.W.2d at 264. The *Ramming* court noted that Keetch slipped and fell in a store from water on the floor thirty minutes after the store sprayed water on the plants. 861 S.W.2d at 465 (citing *Keetch*, 845 S.W.2d at 264). It observed that, in

49

contradistinction to its own case, "[t]here was *no ongoing activity* when Keetch was injured," and, therefore, "[t]he trial court properly did not submit a negligent activity theory of liability *on these facts*," i.e., where the negligent activity had ended well before the slip. *Id.* (quoting *Keetch*, 845 S.W.2d at 264) (emphasis added). The court pointed out, "In contrast, [the] test/maintenance activity [on the traffic light] was ongoing at the time of the accident. *There was no time gap*, much less a 30-minute gap, between the alleged negligent activity and the accident." *Id.* (emphasis added).

Here, as in *Ramming*, there was no time gap between Oncor's negligent distribution of electricity to the transformer, Murillo's reaching into the transformer box to disconnect the cable, and Murillo's electrical injury. Murillo was not injured by the hidden danger of properly protected electrical wires in a utility easement about which Oncor had previously warned, as required for this to be a premises defect case. *See Moritz*, 257 S.W.3d at 214–15; *Khan*, 138 S.W.3d at 295. It is, in my view, *Ramming*—and not *Keetch*—that is the relevant authority in this case, along with *Moritz*, *Kahn*, and *Harrison.*

The en banc majority, however, because it discounts the possibility *ab initio* that Murillo's injuries were caused by Oncor's malfeasance, relies on the premises defect cases of *Clayton W. Williams, Jr., Inc. v. Olivo* and *Houston Lighting & Power v. Brooks* to support its conclusion that this is a premises defect case in

50

which Oncor fully discharged the only duty it could have had to Murillo as a utilities easement owner by warning of the danger of electricity in the transformer boxes. However, the facts in those cases too, as in *Keetch*, are wholly different from the facts in this case. Neither *Olivo* nor *Brooks* involved a premises owner's failure to exercise ordinary care over an aspect of the activities on the premises that it controlled. Both involved a one-time, non-ongoing event that created a dangerous condition on the property not attributable to the negligent activity of the premises owner/occupier. Therefore, neither is applicable.

In *Olivo*, an independent contractor, Olivo, suffered an injury after falling from a drill pipe rack onto drill thread protectors left on the ground, and he sued the general contractor, Williams, on a general negligence theory. 952 S.W.2d at 526–27. The supreme court expressly stated that a general contractor, such as the defendant Williams, who is in control of premises "is charged with the same duty as an owner or occupier.´ *Id*. at 527. And it stated that such a person or entity "may be liable for two types of negligence in failing to keep the premises safe: that arising from an activity on the premises, and that arising from a premises defect." *Id.* (citing *Redinger,* 689 S.W.2d at 427).The court observed that the case was "not a negligent activity case because Olivo alleges that he was injured by thread protectors previously left on the ground, not as a contemporaneous result of someone's negligence." *Id.* at 527. The court held that the presence of the drill

51

thread protectors that injured Olivo implicated "a premises defect that the independent contractor [Olivo's employer] allegedly created rather than a negligent activity [of the defendant general contractor, Williams]." *Id.* at 528.

The supreme court opined that Williams, the general contractor, could have been found liable to Olivo on a negligent activity theory if it had retained the right to control an aspect of Olivo's work or had actually exercised control and was negligent "in exercising or failing to exercise control over the part of the independent contractor's work that created the dangerous condition." *Id.* However, contrary to this case, there was no evidence of Williams' negligent exercise of control over the part of Olivo's work that created the dangerous condition.

Here, there was ample evidence of Oncor's negligent exercise of control over its distribution of electricity to the worksite that resulted in its provision of electricity to a transformer on Pad B during the cable disconnection, copper salvage, and transformer removal process on the worksite. Oncor had a contractual and a common-law duty to disconnect the electricity to the site as work proceeded, using the ordinary care of a prudent utility easement owner in control of electricity to the site so that workmen could safely enter the easement where its utilities were located, disconnect the boxes from the de-energized electric cables, salvage their wiring, and leave the transformers ready for Oncor's ongoing removal of its

52

utilities from the site. Instead of performing this work with ordinary care, Oncor negligently failed to disconnect one of the live cables and negligently continued to distribute electricity to the transformer on Pad B, directly and foreseeably causing Murillo's injury when he attempted to disconnect the cable.

The circumstances, allegations, and evidence in *Olivo* are thus entirely unlike those in this case. Olivo's claim was clearly a claim that he was injured by a dangerous condition of the premises: drill thread protectors previously left on the ground by his own employer, an independent contractor, not by the general contractor he sued, and Olivo made no showing that Williams, the general contractor, negligently exercised control over any aspect of his work on the premises. Thus, the only duty imputable to Williams was the duty to warn of a hidden dangerous condition of which it was aware, not the duty to exercise its control of an aspect of the manner of work on the workplace in a safe manner. *See Olivo*, 952 S.W.2d at 527-28. But Olivo neither pled nor showed that Williams in its capacity as general contractor in control of the premises was aware of the drill protectors on the ground and should have either remedied or warned about the danger. *Id.* at 526–27.

*Brooks*, likewise, was clearly a premises defect case, not a negligent activity case. The plaintiff made no showing that the defendant power company h ad assumed a duty of control over any aspect of the construction work taking place on

the worksite where the plaintiff's injuries occurred or that it continued to distribute electricity to the site in disregard of the danger to the workmen. *Brooks*, 336 S.W.2d 603, 605–06 (Tex. 1960). In that case, the defendant power company's high-voltage power lines complied with city ordinances and had a clearance of more than eight feet from the top and side of the hospital building where Brooks, a construction workman smoothing wet concrete on the unfinished third floor of an annex, touched the power lines with the aluminum handle of his broom and was injured. *Id.* at 604–05. Although there was some evidence that the power company knew construction was occurring on the site, no request had been made to the company to de-energize or otherwise protect its power lines prior to the accident, and the company did not know that concrete was going to be poured and smoothed on the day in question or that a fifteen or sixteen foot aluminum-handled mop would be used. *Id.*

The supreme court held that there was no evidence that the power company could have reasonably foreseen that a workman on the building would make contact with its lines and be injured; therefore, its negligence was not established. *Id.* at 605–06. Nor was there any evidence that the power company had actual knowledge of probable danger to the injured workman. *Id.* Moreover, the court specifically clarified that whatever duty the power company owed Brooks was "as a member of the public and not as an employee or as an invitee" of the power

company.  *Id.* at 605.  It expressly distinguished its holding from other cases "where the injured party was either an employee of the defendant or was doing some work at the invitation of and beneficial to the defendant. . . ."  *Id.* at 607.

The circumstances here are the opposite.  Oncor had exclusive control of the supply of electricity to the worksite.  It had been asked and had agreed to remove the last remaining electricity distribution services to the site, including Pad B, so that the type of work Murillo and others were doing—disconnecting the de-energized cables from the transformers so that the wiring could be salvaged and Oncor could subsequently remove the transformer boxes—could be safely performed.  It had sent a crew to the site for that purpose.  However, that crew disconnected only one of the two cables to the area where Murillo was injured, and Oncor negligently continued to distribute electricity through one of the two cables to the transformer on Pad B during the utility removal process being conducted by its own employees and AAA's, proximately causing Murillo's severe electrical injuries when he touched the live electric cable while attempting to disconnect it.

The material circumstances of this case are thus the opposite of those in *Brooks*, and do not support Oncor's claims that, like the electric utilities easement owner in *Brooks*, it had no duty to Murillo beyond the duty of nonfeasance of a utilities easement owner to the general public and that it committed no negligent

acts through its own malfeasance that foreseeably and directly caused Murillo's injury.

None of the cases cited by Oncor and the en banc majority support the claim—essential to the en banc majority's holding that this is a premises defect case that was improperly submitted as a negligent activity case—that Oncor's malfeasance in failing to disconnect a live electric cable running to the transformer on Pad B was not a cause in fact of Murillo's injury and is irrelevant to the proper disposition of this case. *See Urena*, 162 S.W.3d at 551 (stating that if defendant's negligence merely furnished condition that made injury possible, there can be no cause in fact). None of them refute the claim that this case is properly characterized as a negligent activity case in which Oncor's own ongoing negligent exercise of its control over the electricity to the transformer proximately caused Murillo's electrical injury. *See Ramming*, 861 S.W.2d at 465–66; *cf. Olivo*, 952 S.W.2d at 527–28.

Nevertheless, Oncor argues that the charge was erroneous and probably caused rendition of an improper judgment against it, and the en banc majority agrees. I turn, therefore, to Oncor's allegations of jury charge error.

## B.    Oncor's Claims of Jury Charge Error

Texas Rule of Civil Procedure 278 provides that the trial court must "submit the questions, instructions and definitions in the form provided by Rule 277, which

are raised by the written pleadings and the evidence." TEX. R. CIV. P. 278; *Harris Cnty. v. Smith*, 96 S.W.3d 230, 236 (Tex. 2002). It continues, "A judgment shall not be reversed because of the failure to submit other and various phases or different shades of the same question." TEX. R. CIV. P. 278. "[I]f the trial court has 'to resolve a legal issue before the jury could properly perform its fact-finding role[,] . . . a party must lodge an objection in time for the trial court to make an appropriate ruling without having to order a new trial.'" *Osterberg*, 12 S.W.3d at 55 (quoting *Holland v. Wal-Mart Stores, Inc.*, 1 S.W.3d 91, 94 (Tex. 1999)).

Additionally, Rule 274 provides that an objecting party "must point out distinctly the objectionable matter and the grounds of the objection"; "[a]ny complaint as to a question, definition, or instruction, on account of any defect, omission, or fault in pleading, is waived unless specifically included in the objections." TEX. R. CIV. P. 274. Correspondingly, Texas Rule of Appellate Procedure 33.1 requires that a complaining party (1) make a timely objection to the trial court that "state[s] the grounds for the ruling that the complaining party [seeks] from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context" and (2) obtain a ruling on his objection. *See* TEX. R. APP. P. 33.1.

I, therefore, address Oncor's complaints about the charge to determine whether the complaints properly allege jury charge error and preserve it for appeal.

57

### 1. Error in the Failure to Include Premises Defect Questions, Definitions, and Instructions

Oncor argues that the trial court erred by failing to include in the jury charge the premises defect definitions and instructions that Oncor and the other defendants requested be included in the broad-form question on control, Question 3, and the broad-form liability question on negligence, Question 4, which together asked the jury to determine whether the listed defendants controlled an aspect of the manner in which Murillo's work was performed in the transformer where he was injured and whether they failed to use ordinary care in exercising that control, proximately causing Murillo's injury

Oncor argues that, as a utility easement owner/occupier, it had no duty to recognize and prevent electrical contact during a construction project. It had only the duty to warn of the danger of electricity inside a transformer box, which was a dangerous condition of the premises. It also argues that its failure to disconnect the electricity running to the transformer on Pad B merely furnished a *condition* that made Murillo's injury possible; *it did not cause it*. Murillo's injury was caused by his own actions in attempting to disconnect the live cable to the transformer. Thus, its negligence was not the cause in fact of Murillo's injuries. *See Urena*, 162 S.W.3d at 551 (discussing causation in negligence context and stating, "If the defendant's negligence merely furnished a condition that made the injuries possible, there can be no cause in fact"). But the argument that Murillo's injury

58

was caused by an *independent* and intervening cause—*not* by Oncor's negligence or as a result of any *foreseeable* consequence of Oncor's negligence—is exactly what the jury would have been asked to decide had Oncor sought the proper inferential rebuttal instruction set out in chapter 3 of the PJCs on general negligence.

Likewise, at the charge conference, the defendants, including Oncor, sought to submit their defensive theory of premises defect liability to disprove the essential duty element and the causation element of Murillo's theory. That is, they sought to replace the definition of the duty owed by the defendants under a negligent activity theory with the duty owed by a property owner on a premises defect theory and to give the jury instructions that would permit it to find that Murillo's injury was caused not by Oncor's negligent distribution of electricity to the transformer on Pad B but by Murillo's own trespass into an electrified transformer about which he had been properly warned by Oncor's standard warnings of the danger of live electricity posted on the transformer box and the transformer inside it. Thus, the changes and additions the defendants sought to make to the broad-form control question and negligence question, Questions Nos. 3 and 4, were *inferential rebuttal* issues—issues that require the plaintiff to prove the nonexistence of an affirmative defense or that "seek[] to disprove the existence of an essential element submitted in another issue." *See Bed, Bath & Beyond, Inc.*

59

*v. Urista*, 211 S.W.3d 753, 756 (Tex. 2006) (quoting *Select Ins. Co. v. Boucher*, 561 S.W.2d 474, 477 (Tex. 1978)).

Unlike alternate theories of liability and damage elements, however, Rule 277 not only mandates broad-form submission "whenever feasible," it also prohibits the submission of inferential rebuttal questions. TEX. R. CIV. P. 277. "[I]nferential rebuttal issues *cannot* be submitted in the jury charge as separate questions and instead must be presented through jury instructions." *Urista,* at 757 (citing TEX. R. CIV. P. 277) (emphasis added).

Yet Oncor never sought to define its duty to Murillo in the charge as the duty of a premises owner to warn of concealed hazards of which it was aware, other than as the *primary* definition of the duty of control in Question 3, which the defendants asked be submitted to the jury *instead of* the duty of ordinary care in controlling an aspect of the manner in which Murillo did his work in the transformer. Nor did it seek inferential rebuttal instructions that would have permitted the jury to find that its negligence was not the cause in fact of Murillo's injury, but that his injury was caused by his own trespass into the transformer box. And it failed to make this request for inferential rebuttal instructions even though Murillo repeatedly pointed out at the charge conference, correctly, that defensive theories, such as Oncor's, can *only* be submitted by inferential rebuttal instructions, and *not* by questions. *See* TEX. R. CIV. P. 277; *Urista*, 211 S.W.3d at 756; Comm.

60

on Pattern Jury Charges, State Bar of Tex., *Tex. Pattern Jury Charges: General Negligence & Intentional Personal Torts* ch. 3 (2012) (containing inferential rebuttal instructions). It is instructive to consider why Oncor did not seek these instructions.

Had Oncor sought inferential rebuttal instructions on its defensive theory of premises defect liability, and had the trial court granted this request and modified the instructions in Question 4 to permit the jury to find that a *new and independent cause* of Murillo's injury—Murillo's trespass into Oncor's easement to attempt to disconnect the live cable—*broke the causal connection* between Oncor's negligence and Murillo's injury, it would also have had to instruct the jury that Murillo's injury had to be an *unforeseeable consequence* of Oncor's own negligent activity.

The problem was that no such instruction could be reasonably supported by the facts of the case. Therefore, all of the warnings set out in the PJCs on general negligence for improper submission of a case to the jury would have come into play. These include the warning that "giving multiple instructions on every possible rebuttal inference has the potential to skew the jury's analysis." Comm. on Pattern Jury Charges, State Bar of Tex., *Tex. Pattern Jury Charges: General Negligence & Intentional Personal Torts* ch. 3 note (2012) (quoting *Dillard v. Tex. Elec. Coop.*, 157 S.W.3d 429, 433 (Tex. 2005)); *see id.* PJC 3.1 cmt. "Caveat."

61

And they include the warning in the comment to PJC 3.1 that where there is no evidence that the occurrence was caused by a new and independent cause—a cause that in a non-foreseeable way destroys the causal connection between the negligent act and the plaintiff's injury—submission of an inferential rebuttal instruction on the new and independent cause "is improper and may be reversible error." *Id.* PJC 3.1 cmt. (citing *Galvan v. Fedder*, 678 S.W.2d 596, 598–99 (Tex. App.—Houston [14th Dist.] 1984, no writ), and *James v. Kloos*, 75 S.W.3d 153, 162–63 (Tex. App.—Fort Worth 2002, no pet.)).

I would hold that Oncor waived its objection that the case should have been submitted to the jury on a premises defect theory by failing to seek proper inferential rebuttal instructions. But, even if it did not, the trial court did not err in refusing to submit the defendants' request for premises defect instructions.

### 2. Error in the Jury's Finding that Oncor's Negligent Activity Was Contemporaneous with Murillo's Injury

Oncor also contends in this appeal that it cannot be held liable to Murillo on a negligence theory of liability because its failure to turn off an existing energized electrical transformer on June 12 was not *contemporaneous* with Murillo's injury on July 25; thus, the evidence is *legally* insufficient to support the jury's verdict finding it liable to Murillo for negligence. Without evidence of contemporaneous conduct, it argues, Murillo's claim against it is "a nonfeasance theory, based on [its] failure to take measures to make the property safe," and not an activity "based

62

on affirmative, contemporaneous conduct by [Oncor] that caused the injury." *See Del Lago*, 307 S.W.3d at 776. Therefore, Murillo's only claim against it is a premises-defect claim.

Oncor thus seeks a legal ruling on contemporaneity from this Court that it failed to seek from to the trial court prior to the submission of the charge. *See Osterberg*, 12 S.W.3d at 55 (if trial court has to resolve legal issue before jury could properly perform its fact-finding role, party must lodge objection in time for trial court to make appropriate ruling without having to order new trial). Instead, in the trial court, Oncor joined the defendants' request that the *jury* decide whether the negligence of the listed defendants was contemporaneous with Murillo's injury, and the trial court gave the instruction that the jury was to answer "Yes" to the question whether a listed defendant's negligence "proximately cause[d] the injury in question . . . only if [it found] that Marco Murillo was injured by or as a contemporaneous result of some activity of that person or entity."

Thus, I would hold that Oncor waived any objection to the charge based on its claim that its negligent activity was not contemporaneous with Murillo's injury. *See* TEX. R. CIV. P. 278 (providing that trial court must submit questions, instructions, and definitions raised by pleadings and evidence in form provided by Rule 277); TEX. R. CIV. P. 274 (providing that objecting party "must point out distinctly the objectionable matter and the grounds of the objection" and that

"[a]ny complaint as to a question, definition, or instruction, on account of any defect, omission, or fault in pleading, is waived unless specifically included in the objections.").

I would hold that the case was properly submitted on broad-form negligent activity questions as to the liability of all defendants and that Oncor does not identify any reversible error in the charge. *See* Tex. R. Civ. P. 277 (requiring that "the court shall, whenever feasible, submit the cause upon broad-form questions"); *see also Tex. Dep't of Human Servs. v. E.B.*, 802 S.W.2d 647, 649 (Tex. 1990) (interpreting "whenever feasible" as mandating broad-form submission "in any or every instance in which it is capable of being accomplished"); Comm. on Pattern Jury Charges, State Bar of Tex., *Tex. Pattern Jury Charges: General Negligence & Intentional Personal Torts* PJC 4.1 cmt. (2012).

### C. The En Banc Majority's Reliance on Premises Defect Cases to Support its Holding Rendering Judgment in Favor of Oncor

Murillo sought submission only of his negligent activity theory of liability to the jury, and his claim succeeds or fails on that theory, not on an alternative theory of how his claim *might have been submitted* on a hypothetical charge that was neither properly sought nor given. Neither Oncor nor the en banc majority has identified any error in the *actual* charge, and the evidence is, in my view, plainly sufficient to support the jury's findings. Therefore, I can find no basis to reverse

the trial court's judgment for jury charge error, much less to render judgment in favor of Oncor.

The en banc majority, however, concludes as a threshold matter that the trial court committed harmful error by failing to submit the case to the jury—at least as to Oncor—on the defendants' premises defect defense rather than on Murillo's general negligence theory of liability. Thus, it does not consider whether Oncor had the duty set out in the charge—namely a duty to Murillo to use ordinary care in controlling the distribution of electricity to the transformer on Pad B where Murillo was injured while attempting to disconnect the transformer from a live cable—or whether Oncor could have breached its duty by its negligent exercise of such a duty. *See Moritz*, 257 S.W.3d at 214; *Corbin*, 648 S.W.2d at 295 (distinguishing negligent activity theory of liability of premises occupier from premises defect theory of liability). Nor does it consider Murillo's nearly being electrocuted when, in the course of his work, he attempted to disconnect the live cable running to the transformer on Pad B as evidence that Oncor's negligent activity in controlling the distribution of electricity to the transformer was contemporaneous with Murillo's injury and proximately caused it. *A fortiori*, viewing the case solely as a premises defect case in which Oncor had no duty to Murillo other than the duty to warn of a hidden danger on the premises, the en banc majority does not find any evidence to support the jury's finding that Oncor had

65

and breached a duty of care in safely controlling the distribution of electricity to the transformer.

Because the en banc majority never reviews the sufficiency of the evidence to support the jury's findings under the actual charge on the plaintiff's negligent activity theory of liability, and because it finds the evidence it deems relevant to be insufficient to support the jury's findings under its hypothetically correct charge on a premises defect theory, it holds that the judgment in Murillo's favor must be reversed and judgment rendered in Oncor's favor. This holding follows because, in the majority's view, Murillo failed to plead the only claim he could have made against Oncor—a claim for breach of the duty owed by a utilities easement owner to the general public to warn of a hidden danger of which it knows. And, the en banc majority points out, Oncor fulfilled this duty by posting signs on its transformer boxes that they contained dangerous electricity. Slip Op. at 23–24. It follows that Murillo had no claim of any kind against Oncor.

The en banc majority again relies on *Olivo*, and also on *Torrington Co. v. Stutzman*, 46 S.W.3d 829 (Tex. 2000)—cases in which the supreme court found the jury charge defective for failing to include questions and instructions on the *genuinely* only available theory—as support for its ruling on jury charge error and for its rendition of judgment in favor of Oncor. These cases are, however, wholly unlike this case and inapplicable to it.

In *Olivo*, as stated above, the supreme court clearly distinguished between the "two types of negligence in failing to keep the premises safe: that arising from an activity on the premises, and that arising from a premises defect." 952 S.W.2d at 527. And it held that the general contractor could be held liable to Olivo, the employee of an independent contractor, only if it had retained "the right of control over the injury-causing activity or condition." *Id.* But the plaintiff, Olivo, had made no showing that Williams had negligently exercised control over any aspect of his work on the premises; and he had also neither pled nor showed that Williams was aware of the presence of the drill protectors that injured Olivo and should have warned about them. *Id.* Because "the case fits in the second category . . . and involves a premises defect that the *independent contractor* [and *not* the defendant general contractor] created," the trial court erred by failing to require that the premises defect instructions be given. *Id.* at 528–29.

Here, by contrast, Murillo specifically pled that Oncor itself—the utilities easement owner—controlled the distribution of electricity to the transformer on Pad B and, by its own negligent activity in failing to disconnect the electricity running through the cable and continuing to distribute electricity through it to the transformer, proximately caused his injuries when he attempted to disconnect the cable from the transformer. Therefore, the trial court did not err in submitting the

67

case to the jury on broad-form questions as to control and negligence. This case is, therefore, entirely unlike *Olivo* on the jury charge issue.

*Torrington*, also relied on by the en banc majority, is neither a premises defect nor a negligent activity liability case. It is a products liability case brought in connection with a helicopter crash in which two marines died. *See Torrington Co.*, 46 S.W.3d at 832. The issue was whether the defendant ball-bearing manufacturer had undertaken a duty to investigate and identify defective bearings. *Id.* at 837–38. The case was submitted to the jury on a broad-form negligence liability question as to the defendant's breach of that duty, without a predicate question as to whether it had undertaken such a duty. *See id.*

Analogizing to *Olivo*, in which the plaintiff's premises defect liability claim had been submitted to the jury without the necessary predicate questions to establish Williams' duty to Olivo, the supreme court observed in *Torrington* that "[p]remises liability cases are similar to undertaking cases in that the plaintiff seeks to impose a duty on another to take protective action based upon special circumstances or the relationship between the parties." *Id.* at 838. The court stated that, in the negligent undertaking case at issue, "the broad-form negligence question allowed the jury to hold Torrington liable regardless of whether Torrington knew or should have known that its services were necessary to protect others" and "allowed an affirmative answer regardless of whether anyone relied

upon Torrington's undertaking, or whether Torrington's performance of its undertaking increased the plaintiffs' risk of harm." *Id.* The court held that the jury should have been instructed that Torrington was negligent only if it undertook to perform services that it knew or should have known were necessary for the plaintiffs' protection and failed to exercise reasonable care in performing those services, the services were relied on, and the plaintiffs' risk of harm was increased. *Id.* at 838–39.

Here, unlike in *Torrington*, the jury was instructed on what was required to find each of the defendants liable, including Oncor. The jury questions as to whether the defendants each controlled an aspect of the manner in which Murillo's work was performed in the transformer on Pad B and whether they breached the duty of ordinary care in exercising such control, proximately causing Murillo's injuries, were all before the jury and were appropriate and sufficient to establish both duty and breach on the part of Oncor and the other defendants.

Rather than supporting the en banc majority's conclusion that this case should be reversed and judgment rendered against Murillo because the jury was not given predicate instructions necessary to establish the defendant's duty on a premises defect theory of liability, *Torrington* supports the conclusion that in a negligent activity case where the acts that constitute duty, breach, and causation

are well established by the pleadings and stated in the instructions and questions no additional instructions are required.

I thus find *Torrington*, like *Olivo*, to be inapplicable to this case. And I cannot agree with the en banc majority that either supports a finding of jury error or rendition of judgment in favor of Oncor.[6]

**Conclusion**

The Texas Supreme Court has consistently "rejected attempts to blur the distinction" between the liability of a premises owner or occupier for its own negligence and its liability for a premises defect. *Shumake*, 199 S.W.3d at 284. And it has declined "to eliminate all distinction between premises conditions and negligent activities." *Keetch*, 845 S.W.2d at 264. The holding of the en banc majority in this case not only blurs the distinction between these causes of action but eliminates altogether the concept of a premises owner's liability for its own ongoing negligent activity and immunizes property owners in general and utility easement owners in particular to liability for any such claims.

In my view, the submission of this case to the jury on a negligent activity theory of liability was proper, there was no error in the charge, and the evidence was legally and factually sufficient to support the jury's verdict in favor of Murillo.

---

[6]  I note that, in *Torrington*, the supreme court *remanded* the case to the trial court because it had clarified the law in its opinion; it did not reverse and render judgment as the en banc majority does here. *See Torrington Co. v. Stutzman*, 46 S.W.3d 829, 839–41 (Tex. 2000).

70

Therefore, I would affirm the trial court's judgment on the verdict holding Oncor liable to Murillo for its negligence, and I would leave the judgment against the other defendants undisturbed.


                                        Evelyn V. Keyes
                                        Justice

Justice Bland, joined by Chief Justice Radack, and by Justices Jennings, Higley, Massengale, and Huddle, for the en banc court.

Justice Keyes, joined by Justice Sharp, dissenting.

Justice Brown, not participating.